CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO: 2018-2244



CARY GOMEZ

VERSUS

AARDVARK CONTRACTORS, INC., ANCO INSULATIONS, INC., A.W.
CHESTERTON COMPANY, BAYER CROPSCIENCE, INC. (as successor to Rhone
Poulenc AG Company, f/k/a Amchem Products, Inc., f/k/a Benjamin Foster Company),
BEXAR CANYON MANAGEMENT, INC. (f/k/a H.B. Zachry Company), BURMASTER
LAND & DEVELOPMENT CO., LLC (f/k/a E.F. Burmaster & Sons, f/k/a Burmaster
Land and Development Co., Inc.), CBS CORPORATION (a Delaware corporation, f/k/a
Viacom, Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a
Westinghouse Electric Corporation), CERTAIN-TEED CORPORATION (f/k/a Certain-
Teed Products Corporation), CHARLES JOHNSON, CHARLES SHANO, SR., CRANE
CO., CRESCENT MATERIALS SERVICE, INC., FMC CORPORATION (individually
and as successor in interest to Crosby Valve, Inc. and Peerless Pump Corporation), CSR,
LIMITED, FOSTER WHEELER CORPORATION, GENERAL ELECTRIC COMPANY,
GOULDS PUMPS, LLC, GREFCO, INC., HOPEMAN BROTHERS, INC.,
HUNTINGTON INGALLS INCORPORATED (f/k/a Northrop Grumman Shipbuilding,
Inc.), IDEX CORPORATION (f/k/a Viking Pump, Inc.), INGERSOLL-RAND
COMPANY, INTERNATIONAL PAPER COMPANY (f/k/a Champion International
Corporation, f/k/a U.S. Plywood Corporation), JEFFERSON PARISH SCHOOL BOARD,
JOHN CRANE, INC., LIBERTY MUTUAL GROUP, INC. (as the insurer of Wayne
Manufacturing Co.), MARYLAND CASUALTY COMPANY (as the insurer of Marquette
Insulations, Inc.), METROPOLITAN LIFE INSURANCE COMPANY, OWENS-
ILLINOIS, INC., TAYLOR-SEIDENBACH, INC., THE McCARTY CORPORATION,
UNIVERSITY OF LOUISIANA SYSTEM BOARD OF SUPERVISORS THROUGH
NICHOLLS STATE UNIVERSITY, WARREN PUMPS, LLC, WEIR VALVES &
CONTROLS USA, INC. (f/k/a Atwood & Morrill Co., Inc.), AND WORLD TRADE
CENTER OF NEW ORLEANS, INC.

FILED:_____          _____

                                        **DEPUTY CLERK**

## ORIGINAL PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes petitioner, Cary Gomez,

who files this Original Petition for Damages and respectfully represents:

1.

Petitioner, Cary Gomez, is a person of the full age of majority, and is a domiciliary of

Jefferson Parish, Louisiana.

2.

Made Defendants herein are the following:

AARDVARK CONTRACTORS, INC., a Louisiana corporation with its registered
office in Jefferson Parish and with its registered agent for service of process being Charles P.
Shano, Sr., 3116 Barataria Boulevard, Marrero, Louisiana 70072.

**ANCO INSULATIONS, INC.,** a Louisiana corporation with its registered office in East Baton Rouge Parish and with its registered agent for service of process being Brent J. Bourgeois, Roedel, Parsons, Koch, Blache, Balhoff, & McCollister at 8440 Jefferson Highway, Suite 301, Baton Rouge, Louisiana 70809-7654.

**A.W. CHESTERTON COMPANY,** a foreign corporation licensed to do business in Louisiana, but organized, created, and existing under and by virtue of the laws of the State of Massachusetts, with its principal business establishment in Louisiana in Caddo Parish, and whose registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**BAYER CROPSCIENCE, INC. (as successor to Rhone-Poulenc AG Company, f/k/a Amchem Products, Inc., f/k/a Benjamin Foster Company),** a foreign corporation organized, created, and existing under and by virtue of the laws of the State of New York, with its registered agent for service of process being Corporation Service Company, 80 State Street, Albany, New York 12207-2543.

**BEXAR CANYON MANAGEMENT, INC. (f/k/a H.B. Zachry Company),** a foreign corporation organized, created, and existing under and by virtue of the laws of the State of Delaware, but licensed to do and doing business in Louisiana, with its primary place of business in Louisiana in East Baton Rouge Parish, and whose registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**BURMASTER LAND & DEVELOPMENT CO., LLC (f/k/a E.F. Burmaster & Sons, f/k/a Burmaster Land and Development Co., Inc.),** a Louisiana limited liability company authorized to do and doing business in the State of Louisiana, with its registered office located in St. Tammany Parish, and which can be served through its registered agent for service of process: A.J. Burmaster, 7033 Edgewater Drive, Mandeville, Louisiana 70471.

**CBS CORPORATION (a Delaware corporation, f/k/a Viacom, Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation),** a foreign corporation not licensed to do business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of Delaware, which may be served through the Louisiana Long-Arm Statute at Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

**CERTAIN-TEED CORPORATION (f/k/a Certain-Teed Products Corporation),** a foreign corporation organized, created and existing under and by virtue of the laws of the State of Maryland with its principal place of business in Maryland. Certain-Teed Corporation is also sued by virtue of its acquisition of Brand Insulations, Inc., during Certain-Teed's merger with Gustin-Beacon Manufacturing Company in 1966; prior to transfer of stock of Brand Insulations into a joint venture known as Certain-Teed Saint Gobain, whose principal place of business is Swedesford & Old School Roads, Valley Forge, Pennsylvania   19481. Certain-Teed Corporation's registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**CHARLES JOHNSON,** a person of the full age of majority and domiciled in Waynesboro, Virginia and whose address is 436 Raleigh Court, Waynesboro, Virginia 22980. Mr. Johnson was responsible for the health and safety of employees at Hopeman Brothers Incorporated.

**CHARLES P. SHANO, SR.,** a person of the full age of majority and domiciled in Marrero, Louisiana and whose address is 3116 Barataria Boulevard, Marrero, Louisiana 70072. Mr. Shano, Sr. was responsible for the health and safety of employees at Aardvark Contractors, Inc.

**CRANE CO.,** a foreign corporation organized, created, and existing under and by virtue of the laws of the State of Delaware which may be served through the Louisiana Long-Arm Statute at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

**CRESCENT MATERIALS SERVICE, INC.,** a Louisiana corporation with its registered office in Jefferson Parish and with its registered agent for service of process being Elizabeth F. Pretus Ebarb, 10016 Idlewood Place, River Ridge, Louisiana 70123.

**FMC CORPORATION (individually and as successor in interest to Crosby Valve, Inc. and Peerless Pump Corporation),** a foreign corporation organized, created, and existing under and by virtue of the laws of the State of Pennsylvania, with its principal place of business at 1735 Market Street, Philadelphia, Pennsylvania 19103, and with its registered agent for service of process being C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**CSR, LIMITED ("hereinafter referred to as CSR"),** an Australian corporation authorized to do and/or doing business in the State of Louisiana that was engaged in the business of mining, manufacturing, selling, distributing and/or supplying asbestos, which was expected to and did reach, including but not limited to, Louisiana and the New Orleans area. CSR may be served through its agent for service in the State of Louisiana, namely: Frank Accardo, Esq., 1100 Poydras Street, 3200 Energy Centre, New Orleans, LA 70163-1132; and counsel of record in California may also be served pursuant to the Louisiana Long Arm Statute, to wit: Michael Futterman, Esq., Futterman & Dupree, LLP, 160 Sansome Street, 17th Floor, San Francisco, California 94104. And may also be served pursuant to the Louisiana Long Arm Statute, to-wit: CSR Limited, 9 Help Street, Chatswood, New South Whales, Australia 2067. This defendant is being sued as an Asbestos Miner/Manufacturer/Seller/Supplier/Distributer Defendant.

**FOSTER WHEELER CORPORATION,** a foreign corporation organized, created, and existing under and by virtue of the laws of the State of Delaware which may be served through the Louisiana Long-Arm Statute at United States Corporation Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

**GENERAL ELECTRIC COMPANY,** a foreign corporation organized, created and existing under and by virtue of the laws of the State of Connecticut, with its principal business establishment at 3135 Easton Turnpike, Fairfield, Connecticut 06828, and with its registered agent for service of process being C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**GOULDS PUMPS, LLC,** a foreign corporation licensed to do and doing business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of New York, with its principal business establishment in Louisiana in East Baton Rouge Parish and its registered agent for service of process being C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**GREFCO, INC.,** a foreign corporation licensed to do and doing business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of California, with its principal business establishment in Louisiana in East Baton Rouge Parish, and whose registered agent for service of process is Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, Louisiana 70802.

**HOPEMAN BROTHERS, INC.,** a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created and existing under and by virtue of the laws of the State of Delaware and over which this Honorable Court has personal jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

**HUNTINGTON INGALLS INCORPORATED (f/k/a Northrop Grumman Shipbuilding, Inc.),** a foreign corporation organized, created, and existing under and by virtue of the laws of the State of Virginia, with its principal place of business at 4101 Washington Avenue, Newport News, Virginia 23607, and whose registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**IDEX CORPORATION (f/k/a Viking Pump, Inc.),** a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created and existing under and by virtue of the laws of the State of Illinois and over which this Honorable Court has personal jurisdiction pursuant to the Louisiana Long-Arm Statute, and which can be served thereunder at C.T. Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

**INGERSOLL-RAND COMPANY,** a foreign corporation licensed to do business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of New Jersey, with its principal business establishment in Louisiana in Orleans Parish and whose registered agent for service of process is Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, Louisiana 70802.

**INTERNATIONAL PAPER COMPANY (f/k/a Champion International Corporation, f/k/a U.S. Plywood Corporation),** a foreign corporation licensed to do business in Louisiana, but organized, created, and existing under and by virtue of the laws of the State of Tennessee, with its principal business establishment in Louisiana in Morehouse Parish, and whose registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**JEFFERSON PARISH SCHOOL BOARD,** a political subdivision of the State of Louisiana, which can be served through its President, Mark Morgan, 501 Manhattan Boulevard, Harvey, Louisiana 70058.

**JOHN CRANE, INC.,** a foreign corporation licensed to do and doing business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of Illinois, with its principal business establishment in Louisiana in East Baton Rouge Parish, and whose registered agent for service of process is C.T. Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

**LIBERTY MUTUAL GROUP, INC. (as the insurer of Wayne Manufacturing Co.),** a foreign insurance company which can be served through the Louisiana Secretary of State, 3851 Essen Lane, Baton Rouge, Louisiana 70809.

**MARYLAND CASUALTY COMPANY (as the insurer of Marquette Insulations, Inc.),** a foreign insurance company which can be served through the Louisiana Secretary of State, 3851 Essen Lane, Baton Rouge, Louisiana 70809.

**METROPOLITAN LIFE INSURANCE COMPANY,** a foreign insurance company which can be served through the Louisiana Secretary of State, 3851 Essen Lane, Baton Rouge, Louisiana 70809.

**OWENS-ILLINOIS, INC.,** a foreign corporation not currently licensed to do business in the State of Louisiana, but organized, created and existing under and by virtue of the laws of the State of Delaware, and which may be served under the Louisiana Long-Arm Statute at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

**TAYLOR-SEIDENBACH, INC.,** a Louisiana corporation with its registered office in Orleans Parish, and whose agent for service of process is Robert I. Shepard, 731 South Scott Street, New Orleans, Louisiana 70119.

**THE McCARTY CORPORATION,** a Louisiana corporation with its registered office in East Baton Rouge Parish, and whose agent for service of process is Paul Spaht, 4232 Bluebonnet Blvd., Baton Rouge, Louisiana 70809.

**UNIVERSITY OF LOUISIANA SYSTEM BOARD OF SUPERVISORS THROUGH NICHOLLS STATE UNIVERSITY,** a political subdivision of the State of Louisiana, which can be served through its President, Dr. Jim Henderson, 1201 North Third Street, Suite 7-300, Baton Rouge, Louisiana 70802.

**WARREN PUMPS, LLC,** a foreign corporation not currently licensed to do business in Louisiana, but organized, created, and existing under and by virtue of the laws of the State of Delaware which may be served under the Louisiana Long-Arm Statute at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

**WEIR VALVES & CONTROLS USA, INC. (f/k/a Atwood & Morrill Co., Inc.),** a foreign corporation not currently licensed to be business in Louisiana, but organized, created and existing under and by virtue of the laws of the State of Massachusetts, which may be served under the Louisiana Long-Arm Statute at CT Corporation System, 155 Federal Street, Suite 700, Boston, Massachusetts 02110.

**WORLD TRADE CENTER OF NEW ORLEANS, INC.,** a Louisiana corporation with its registered office in Orleans Parish, and whose agent for service of process is Caitlin Cain, 365 Canal Street, Suite 1120, New Orleans, Louisiana 70130.

3.

Cary Gomez suffered severe asbestos exposure from a number of different sources throughout his life. Plaintiff was exposed thru his father, Stanley Anthony Gomez, who had substantial exposure to asbestos and asbestos-containing products sold, distributed, supplied, applied, removed, used, manipulated and/or maintained on defendants' premise at Avondale Shipyard during the 1960s.  Further, Cary Gomez was regularly exposed to significant amounts of asbestos as a result of his employment as a plumber at Aardvark Contractors, Inc. where he routinely worked on and around asbestos and asbestos containing insulation at a variety of locations throughout Orleans and Jefferson Parishes including, but not limited to, Jefferson Parish School Board facilities from 1988 until 2011, The World Trade Center of New Orleans, Jefferson Parish public buildings, and others. Additionally, Mr. Gomez worked on materials believed to be asbestos or asbestos containing at Nicholls State University.

4.

During the above mentioned periods of time Cary Gomez was frequently and regularly exposed to and did inhale or otherwise ingest harmful asbestos particles and dust.

5.

When inhaled or otherwise ingested, asbestos causes irreparable and progressive lung damage that can manifest itself as asbestos-related pleural disease, asbestosis, pulmonary and bronchogenic carcinoma, mesothelioma, and other diseases and injuries.

6.

As a result of his asbestos exposure, Cary Gomez was diagnosed with malignant pleural mesothelioma after a pleural biopsy was performed on plaintiff on or about October 2, 2017.

7.

Over the course of his life, Cary Gomez has endured an extreme amount of asbestos exposure as indicated above at the aforementioned premises and as a result of the products and activities of the aforementioned Defendants.

## MANUFACTURERS' LIABILITY

8.

At all times relevant hereto, Defendant **ANCO INSULATIONS, INC.,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

9.

At all times relevant hereto, Defendant **A.W. CHESTERTON COMPANY,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

10.

At all times relevant hereto, Defendant **BAYER CROPSCIENCE, INC.,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

11.

At all times relevant hereto, Defendant **CERTAIN-TEED CORPORATION,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

12.

At all times relevant hereto, Defendant **HOPEMAN BROTHERS, INC. (individually and as successor to Wayne Manufacturing Company)** manufactured, distributed and installed asbestos-containing products that were used at Avondale Shipyard, including but not limited to Micarta wall board.  Hopeman Brothers, Inc. (hereinafter "Hopeman Brothers") is strictly liable for manufacturing defective products which caused plaintiff harm. Additionally, **HOPEMAN BROTHERS AND CHARLES JOHNSON** are liable for the reasons set forth in the following paragraph.

13.

Wayne Manufacturing Company manufactured and distributed asbestos containing products, specifically laminated wall boards on panels, consisting of marinite panels manufactured and distributed by Johns Manville Corporation and Micarta manufactured and distributed by Westinghouse Corporation, which were used at Avondale Shipyard.

14.

Upon information and belief, Defendants **HOPEMAN BROTHERS AND CHARLES JOHNSON**, were negligent in the handling of asbestos at Avondale Shipyard at times when plaintiff was *not* employed by them, but during which times defendants owed a duty to protect bystanders from the hazards posed by their operations.

15.

Charles Johnson was head of shipyard operations for Hopeman Brothers and was responsible for the health and safety of this plaintiff exposed via "take home" exposures. Hopeman Brothers and Charles Johnson failed to warn of these known hazards.

16.

Defendants **HOPEMAN BROTHERS AND CHARLES JOHNSON** negligently breached their duty to protect bystanders from the hazards of asbestos, which breach resulted in injury and disease to the plaintiff. Defendant's negligence in the handling of asbestos included, but was not limited to:

a)   failure to warn of the hazards of exposure to asbestos dust;

b)   failure to implement proper industrial hygiene procedures to prevent exposure to bystanders;

c)   sawing, cutting and otherwise handling asbestos containing products resulting in the production of significant quantities of airborne asbestos; and

d)   failure to provide adequate respiratory protection equipment to bystanders known to be working in the vicinity of respirable asbestos products.

17.

At all times relevant hereto, Defendant **CRANE CO.**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Avondale Shipyard.

18.

At all times relevant hereto, Defendant **CRESCENT MATERIALS SERVICE, INC.,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

19.

At all times relevant hereto, Defendant **CSR, LIMITED,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

20.

At all times relevant hereto, Defendant **FMC CORPORATION (individually and as successor in interest to CROSBY VALVE, INC. and Peerless Pump Corporation)**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

21.

At all times relevant hereto, Defendant **BEXAR CANYON MANAGEMENT, INC. (f/k/a H.B. Zachry Company)**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

22.

At all times relevant hereto, Defendants **JEFFERSON PARISH SCHOOL BOARD, UNIVERSITY OF LOUISIANA SYSTEM BOARD OF SUPERVISORS THROUGH NICHOLLS STATE UNIVERSITY, and WORLD TRADE CENTER OF NEW ORLEANS, INC.** designed, evaluated, manufactured, packaged, furnished, stored, utilized, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products. **JEFFERSON PARISH SCHOOL BOARD, UNIVERSITY OF LOUISIANA SYSTEM BOARD OF SUPERVISORS THROUGH NICHOLLS STATE UNIVERSITY, and WORLD TRADE CENTER OF NEW ORLEANS, INC.** and its respective executive officers are jointly, severally, and in solido, liable to plaintiff for the following acts of negligence:

    a)    Failure to maintain their premises in a safe condition;

    b)    Failure to provide petitioner with proper safety equipment;

    c)    Failure to warn of a hazardous and perilous condition;

d)     Failure to exercise due care and caution for the safety and integrity of their premises;

e)     Failure to provide adequate monitoring and maintenance of their premises;

f)     Failure to adequately supervise the employees responsible for maintaining the safety and integrity of their premises;

g)     Failure to adequately warn of the dangers of their premises; and

h)     Any and all acts of negligence which may be proven at a trial of this matter.

23.

At all times relevant hereto, Defendant **FOSTER WHEELER CORPORATION,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

24.

At all times relevant hereto, Defendant **GENERAL ELECTRIC COMPANY,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

25.

At all times relevant hereto, Defendant **BURMASTER LAND & DEVELOPMENT CO., LLC (f/k/a E.F. Burmaster & Sons, f/k/a Burmaster Land and Development Co., Inc.),** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

26.

At all times relevant hereto, Defendant **GOULDS PUMPS, LLC**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

27.

At all times relevant hereto, Defendant **GREFCO, INC.,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

28.

At all times relevant hereto, Defendant **HUNTINGTON INGALLS INC. (f/k/a Northrop Grumman Shipbuilding, Inc.)**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Avondale Shipyard.

29.

Avondale Shipyard delegated duties to its safety department, and more particularly to Burnett "Frenchy" Bordelon, John Chantrey, Peter Territo, James O'Donnell, George Kelmell, and Steve Kennedy, Lou Cognevich, Raymond Young, Tommy Valle, Malcolm Fontenotte, J. D. Roberts, Ewing Moore, Rodney Duhon, Dewayne Clark, Sr., William Harmeyer, R. F. Brunner, Kenneth Genter, A. J. Oberfell, Ollie Gatlin, Charles "Chuck" Starkenburg and Paul Tregre and its superintendents, more particularly, Albert Bossier. These named individuals each had the responsibility of providing a safe place to work and safety equipment with which to conduct work; however, they negligently and/or intentionally failed to protect plaintiff from the dangers of toxic fiber and dust exposure. These named individuals breached their individual duties to plaintiff herein and are amenable to suit under La. R.S. 22:655 and 22:983(e).

30.

Peter Territo, Ollie Gatlin, Charles Johnson and their respective executive officers are jointly, severally, and in solido, liable to plaintiff for the following acts of negligence:

a) Failure to maintain its premises in a safe condition;

b) Failure to provide petitioner with proper safety equipment;

c) Failure to warn of a hazardous and perilous condition;

d) Failure to exercise due care and caution for the safety and integrity of the premises;

e) Failure to provide adequate monitoring and maintenance of the premises;

f) Failure to adequately supervise the employees responsible for maintaining the safety and integrity of the premises;

g) Failure to adequately warn of the dangers of the premises; and

h) Any and all acts of negligence which may be proven at a trial of this matter.

31.

At all times relevant hereto, Defendant **IDEX CORPORATION (f/k/a Viking Pump, Inc.)**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

32.

At all times relevant hereto, Defendant **INGERSOLL-RAND COMPANY**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

33.

At all times relevant hereto, Defendant **INTERNATIONAL PAPER COMPANY (f/k/a Champion International Corporation, f/k/a U.S. Plywood Corporation)**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

34.

At all times relevant hereto, Defendant **JOHN CRANE, INC.**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

35.

At all times relevant hereto, Defendant **LIBERTY MUTUAL GROUP, INC. (as the insurer of Wayne Manufacturing Co.)**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

36.

At all times relevant hereto, Defendant **MARYLAND CASUALTY COMPANY (as the insurer of Marquette Insulations)**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

37.

At all times relevant hereto, Defendant **METROPOLITAN LIFE INSURANCE COMPANY,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

38.

At all times relevant hereto, Defendant **OWENS-ILLINOIS, INC.,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites.

39.

At all times relevant hereto, Defendant **AARDVARK CONTRACTORS, INC.,** designed, evaluated, manufactured, packaged, furnished, stored, utilized, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products. **AARDVARK CONTRACTORS, INC.** and its respective executive officers are jointly, severally, and in solido, liable to plaintiff for the following acts of negligence:

a)   Failure to maintain its premises in a safe condition;

b)   Failure to provide petitioner with proper safety equipment;

c)   Failure to warn of a hazardous and perilous condition;

d)   Failure to exercise due care and caution for the safety and integrity of the premises;

e)   Failure to provide adequate monitoring and maintenance of the premises;

f)   Failure to adequately supervise the employees responsible for maintaining the safety and integrity of the premises;

g)   Failure to adequately warn of the dangers of the premises; and

h)   Any and all acts of negligence which may be proven at a trial of this matter.

40.

At all times relevant hereto, **TAYLOR-SEIDENBACH INCORPORATED,** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos containing products to Plaintiff's exposure sites.

41.

At all times relevant hereto, Defendant **THE MCCARTY CORPORATION**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos-containing products to Plaintiff's exposure sites..

42.

At all times relevant hereto, **CBS CORPORATION**, designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos containing products to Plaintiff's exposure sites.

43.

At all times relevant hereto, **WARREN PUMPS, L.L.C.,** designed, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos containing products to Plaintiff's exposure sites.

44.

At all times relevant hereto, **WEIR VALVES & CONTROLS USA INCORPORATED (f/k/a Atwood & Morrill Co., Inc.),** designed, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, distributed, sold and/or supplied asbestos containing products to Plaintiff's exposure sites.

45.

These Defendants, individually, jointly and severally, and in solido, are strictly liable to the petitioner because the asbestos containing products designed, manufactured, assembled, fabricated, supplied, sold, marketed, warranted, advertised and/or used by Defendants were defective and unreasonably dangerous per se, and were the producing cause of injury to petitioner.

46.

These Defendants designed, manufactured, fabricated, assembled, supplied, sold, marketed, warranted and/or advertised asbestos and/or asbestos containing products or material, including but not limited to packing, fire bricks, floor tile, cement, felt, paper, pipe covering, block insulation, rope sealants and mastics, sheets, adhesives, refractory material, refractory tile, gaskets, sheet gasket material, mortar, fire clay, and boiler gaskets, the asbestos fibers and/or dust from which was inhaled or otherwise ingested by Cary Gomez.

47.

Defendants are also liable, individually, jointly and severally, and in solido, to the petitioner for and are guilty of the following:

1) manufacturing a product defective in design;

2) failing to properly test their products;

3) failing to properly warn against the dangers inherent in the use of their products;

4) failing to provide proper instructions in the use of its products;

5) failing to furnish proper wearing apparel, masks, respirators, or other devices that might reduce the dangers of the use of their products;

6) failing to instruct or warn of the proper safety devices so as to reduce the dangers of their products; and,

7) Any and other acts of negligence to be shown at the trial of this matter.

48.

As a direct and proximate result of the above described acts of each of the Defendants, Cary Gomez sustained injuries.

## STRICT LIABILITY

49.

Further, these manufacturer Defendants expressly and impliedly warranted to users and/or consumers such as petitioner that their products were reasonably fit for its intended use without endangering human life, and that their products were of merchantable quality.

50.

These Defendants breached the expressed and implied warranty in that their product was defective, which defects in their product permitted and/or caused the injuries to petitioner while using and/or being exposed to their products in a manner that was reasonably foreseeable.

51.

As a direct and proximate result of the described breaches of warranty by Defendants, Petitioner sustained injuries.

52.

Petitioner is uncertain whether or not he was exposed to asbestos products at or as a result of work sites other than the ones enumerated *supra*, but he reserves the right to assert at trial that he was so exposed at other sites, should such evidence develop.  Petitioner avers that should such evidence develop, he will promptly notify Defendants well in advance of trial.

**DISTRIBUTOR'S LIABILITY**

53.

Defendants, **AARDVARK CONTRACTORS, INC., ANCO INSULATIONS, INC., A.W. CHESTERTON COMPANY, BAYER CROPSCIENCE, INC. (as successor to Rhone Poulenc AG Company, f/k/a Amchem Products, Inc., f/k/a Benjamin Foster Company), BEXAR CANYON MANAGEMENT, INC. (f/k/a H.B. Zachry Company), BURMASTER LAND & DEVELOPMENT CO., LLC (f/k/a E.F. Burmaster & Sons, f/k/a Burmaster Land and Development Co., Inc.), CBS CORPORATION (a Delaware corporation, f/k/a Viacom, Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation), CERTAIN-TEED CORPORATION (f/k/a Certain-Teed Products Corporation), CRANE CO., CRESCENT MATERIALS SERVICE, INC., FMC CORPORATION (individually and as successor in interest to Crosby Valve, Inc. and Peerless Pump Corporation), CSR, LIMITED, FOSTER WHEELER CORPORATION, GENERAL ELECTRIC COMPANY,  GOULDS PUMPS, LLC, GREFCO, INC., HOPEMAN BROTHERS, INC., HUNTINGTON INGALLS INCORPORATED (f/k/a Northrop Grumman Shipbuilding, Inc.), IDEX CORPORATION (f/k/a Viking Pump, Inc.), INGERSOLL-RAND COMPANY, INTERNATIONAL PAPER COMPANY (f/k/a Champion International Corporation, f/k/a U.S. Plywood Corporation), JOHN CRANE, INC., OWENS-ILLINOIS, INC., TAYLOR-SEIDENBACH, INC., THE McCARTY CORPORATION, WARREN PUMPS, LLC, AND WEIR VALVES & CONTROLS USA, INC. (f/k/a Atwood & Morrill Co., Inc.),** are liable as distributors, suppliers, installers and re-labelers of products containing asbestos which were defective and unreasonably dangerous per se and were the producing cause of injury to Petitioner. These Defendants will be collectively referred to hereinafter as "Defendant Distributors":

a) Defendant Distributors intentionally failed to warn Petitioner of the known foreseeable dangers of use of the products manufactured, distributed and/or sold;

b) Defendant Distributors knew, or in the exercise of reasonable care, should have known that their insulation products were in a defective condition and unreasonably dangerous, and that their use would cause Petitioner's disease;

c) Defendant Distributors failed to test their products concerning the effect of inhalation or asbestos dust fibers and the ingestion of other materials contained in the insulation upon the human body;

d) Defendant Distributors failed to warn Petitioner of the dangers of working with or around their asbestos containing products;

e) Defendant Distributors failed to either furnish proper wearing apparel, masks, respirators or other devices that might reduce the dangers of the use of their products, and failed to instruct or warn of the proper safety devices so as to reduce the dangers of their products;

f) Defendant Distributors knew that their products would have to be cut, sawed, broken, sprayed, hammered into place, and generally handled in such a manner as to create dust which when ingested into the body would cause severe, permanent and disabling diseases such as asbestosis and mesothelioma;

g) Defendant Distributors knew that there were substantial products that would serve the purpose of high heat insulation which did not contain asbestos, and further knew that said substitute products would not cause severe, permanent and disabling harm to the body of users or consumers; and

h) Any and all other acts of negligence that will be shown at the trial of this matter.

54.

At all times mentioned herein, all Defendants whether corporations or individuals, are individually, jointly, severally, and in solido liable unto petitioner for the damages asserted herein.

Defendants are liable to petitioner for the following damages:

(a)     Physical pain and suffering;

(b)     Mental pain and anguish;

(c)     Loss of enjoyment of life;

(d)     Medical expenses and funeral expenses;

(e)     Loss of wages, past and future;

(f)     Loss of wage earning capacity;

(g)     Fear of death;

(h)     Loss of service and society;

(i)     Loss of consortium; and

(k)     Any and all damages which shall be shown at the trial of this matter.

## LIABILITY OF METROPOLITAN LIFE INSURANCE COMPANY
## SARANAC LABORATORY BACKGROUND

55.

On January 15, 1935, in Pittsburgh, Pennsylvania, during a symposium sponsored by the Mellon Institute of Industrial Research, a representative of Johns-Manville as representative of the Asbestos Industry, Dr. A.J. Lanza, Assistant Medical Director of the Metropolitan Life Insurance Company, and Dr. Donald E. Cummings, Assistant Director of the Saranac Laboratory for the Study of Tuberculosis, met with other members of U.S. Industry to formulate a plan concerning the "dust problem" attendant to all the industries present.   It was recognized at this meeting that only two forms of dust, namely, free silica and asbestos, were definitely known to produce disabling fibrosis of the lung.   At this symposium, common problems to all industries were identified and there was discussion on how to best resolve these problems.

56.

In 1936, the Asbestos Industry decided not to cooperate with other industries, but instead concluded that it would be more beneficial to their interest to operate and control an independent and prominent scientific institute, the Saranac Laboratory. The Saranac Laboratory in upstate New York was a leading research facility on industrial and infectious pulmonary diseases in the United States and had previously enjoyed a close and confidential relationship with the Metropolitan Life Insurance Company, a major underwriter of insurance to the Asbestos Industry.   Metropolitan Life Insurance Company had made substantial contributions to the Saranac Laboratory for help with medical/legal problems concerning its industry insurance.

57.

In November, 1936, the President of Johns-Manville and its attorney, Mr. Vandiver Brown, had a conference with Dr. Leroy U. Gardner of the Saranac Laboratory along with Dr. Lanza and Dr. McConnell of the Metropolitan Life Insurance Company to discuss the asbestos medical situation as it related to the Asbestos Industry. It was decided at this meeting that Dr. Gardner's laboratory at Saranac would be used by the Asbestos Industry conspirators to generate and disseminate only favorable information regarding asbestos disease, so that this "independent" favorable information could be submitted to the public health officials and compensation commissions of the various states when the question of asbestosis arose. This move was calculated to combat any adverse publicity. It was decided that the information obtained would also be distributed to the medical community and the public at large provided it was of the "right" type and only if it would not injure the asbestos companies.

58.

On November 10, 1936, Vandiver Brown of Johns-Manville wrote to F.H. Schluter, President of co-conspirator Thermoid Rubber Company concerning this conference with Dr. Gardner and Dr. Lanza at Saranac. Mr. Brown related the information about the asbestos situation in the Asbestos Industry and confirmed the need for studies paid for by the Industry working as a whole which could be used for future compensation suits.

59.

On Tuesday, November 17, 1936, a meeting was held at the Biltmore Hotel with conspirators Johns-Manville, represented by Mr. Brown; Thermoid Rubber Company, represented by Mr. Schluter; Keasbey and Mattison Company, represented by Mr. A.S. Blagden; Asbestos Manufacturing Company, represented by Mr. H.D. Lamont; Russell Manufacturing Company, represented by Mr. G.M. Williams; and Raybestos Manhatten, Inc., represented by its president, Mr. Sumner Simpson. At this meeting, it was decided that Dr. Gardner's Saranac Laboratory would be employed to conduct and disseminate favorable studies for the Asbestos Industry. Additionally, the conspirators agreed that the results obtained from any such studies by Dr. Gardner and Saranac Laboratory would be considered the property of those advancing the required funds for the studies, who would then determine whether, to what extent, and in what manner the results of any such studies would be made public. Finally, these deceptive practices

were culminated by the agreement that no information would be published prior to approval of each conspirator.

60.

Johns-Manville Corporation agreed to make the payments for the studies directly to the Saranac Laboratory and be reimbursed by the other Asbestos Industry conspirators.

61.

Dr. A.J. Lanza of Metropolitan Life was selected to coordinate the activities between Dr. Gardner of the Saranac Laboratory and the Asbestos Industry, along with Attorney Vandiver Brown of Johns-Manville.   Mr. Brown in turn enlisted the aid, support, and complicity in the conspiracy of Mr. Ivan Sabourin of the Quebec Asbestos Mining Association.

62.

On November 20, 1936, a memorandum of agreement between Dr. Gardner of the Saranac Laboratory and the asbestos conspirators was executed and signed by the agents of the American Brake Block Corporation, the Asbestos Manufacturing Company, the Keasbey and Mattison Company, Raybestos Manhattan, Inc., Gatke Corporation, Johns-Manville Corporation, Russell Manufacturing Company, Union Asbestos and Rubber Company, and the United States Gypsum Company.  Thermoid Rubber Company did not sign the November 20, 1936 agreement; however, they later contributed annually to support the Saranac studies in furtherance of the conspiracy.

63.

Under this agreement, the above named conspirators acquired the power to decide what information Saranac Laboratories could publish about asbestos disease, in what form, and where such publications were to occur.  This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study.  On numerous occasions thereafter, as will be outlined below, these conspirators exercised this power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of material fact being made at scientific meetings, in scientific journals, at medical schools and universities, and to the United States Public Health Service, and to the public health services of the various states.

64.

On November 23, 1936, Dr. Gardner of Saranac Laboratory confirmed to Vandiver Brown of Johns-Manville the authorization to proceed with his experiment at a $5,000 annual sum for three years. Dr. Gardner agreed to the secrecy provisions and agreed to obtain approval of the co-conspirators before any publications were made.

65.

Dr. Gardner's agreement concerning secrecy and non-publication of results without prior approval was scrupulously monitored by Dr. Lanza and Attorney Brown on behalf of the Asbestos Industry, throughout the beginning of the conspiracy and continuing into the mid-1950's when the Saranac Laboratory was closed.

66.

Dr. Gardner at Saranac Laboratory informed Vandiver Brown on February 24, 1943, that he had at last succeeded in analyzing most of the experimental data which had been started in 1936. In a letter to Mr. Brown of that date, he attached a report entitled "Outline of Proposed Monograph on Asbestosis", which monograph included as Part I an essay on human asbestosis and as Part II an essay on experimental asbestosis. Dr. Gardner informed Mr. Brown in this letter that as a result of his experiments, the question of cancer susceptibility was more significant than Dr. Gardner had previously believed. In fact, Dr. Gardner believed that he should continue this cancer susceptibility research and hoped to obtain further funding from the National Cancer Institute. Dr. Gardner further informed Mr. Brown that his work on methods of dust determination was important enough to include in his study because he had found that the current method was deceptive. This finding was significant in the prevention of the asbestosis disease because Dr. Gardner had concluded that there was no practical way to prevent the occurrence of asbestosis after exposure to asbestos dust. Thus, the chief means of controlling the disease would be through control of the air and fiber content to which workers were exposed.

67.

On March 8, 1943, Mr. E. Mueleck, agent of Keasbey and Mattison, wrote to Mr. W.F. Shephard, agent of T&N, PLC, forwarding a copy of Dr. Gardner's proposed monograph on asbestosis, telling him that the other conspirators felt that all references to the question of cancer susceptibility should be omitted from the published report.

68.

Dr. Gardner, who was still bound by the secrecy provisions of the original 1936 Saranac agreement, nevertheless felt that his findings concerning the possibility of carcinogenic action of asbestos fibers was important enough to make a request to Dr. Ludwick Hektoen, Chairman of the Committee on Cancer Research of the National Cancer Institute, for further cancer studies. Dr. Gardner informed Dr. Hektoen that he was startled to discover that a small group of mice showed an excessive incidence (81.8%) of pulmonary cancer.   Dr. Gardner explained that he would have attached little importance to this figure except for the fact that scientific literature had now reported ten cases of pulmonary cancer in cases of human asbestosis.

69.

On June 9, 1943, Dr. Gardner again wrote to Vandiver Brown emphasizing his concern with continuing his cancer studies.   Dr. Gardner, however, reassured Mr. Brown that until he received the necessary funds from the National Cancer Institute for the confirmatory animal studies that he would maintain the agreement of secrecy and say nothing about his observations of cancer.

70.

On September 29, 1943, Dr. Gardner again wrote to Dr. Hektoen at the National Cancer Institute for an answer to his request for funds.  Dr. Gardner described asbestosis as being next to silicosis on the issue of industrial disease importance.

71.

Because of the efforts of the co-conspirators, Dr. Gardner's request for cancer studies was denied.  Most notably were the efforts of Dr. Lanza during the proceedings of the twenty-fourth meeting of the National Advisory Council of the National Cancer Institute held on January 8, 1944 and resulted in the denial for further studies.

72.

On October 24, 1946, Dr. Gardner died. After Dr. Gardner's death, Dr. Lanza visited the Saranac Laboratory and took Dr. Gardner's unfinished report about his asbestosis experiments and represented to the other conspirators that he had Dr. Gardner's note typed from the handwritten form.

73.

On January 21, 1947, at the Johns-Manville general headquarters, Dr. Lanza met with various members and officers of the Johns-Manville Corporation to discuss the late Dr. Gardner's asbestos experiments. It was decided at this meeting that Dr. Kenneth Lynch at the medical school in Charleston, South Carolina would be asked to review the material and to inform the conspirators through Dr. Lanza on whether Dr. Lynch would be able to put Dr. Gardner's material into "publishable" form. Mr. Brown, attorney for Johns-Manville, reminded Dr. Lanza and the others that there would be no publication of the results of the experiments without the conspirators' consent, and further, that no part of the report could include objectional material from the industry point of view, pointing out specifically Dr. Gardner's conclusion about the relationship between asbestos dust and cancer, which Dr. Gardner had previously made in his monograph on asbestosis as cited above.

74.

On June 30, 1947, Dr. Kenneth Lynch, Dean of the Charleston Medical School, informed the conspirators, through a letter to Dr. Lanza, that Dr. Gardner's manuscript should be submitted for publication practically as written. Dr. Lynch pointed out that to corroborate with Dr. Gardner, posthumously, by altering his manuscript, without Dr. Gardner's having contemplated those changes, would not be proper.

75.

Because of Dr. Lynch's refusal to change Dr. Gardner's manuscript, the conspirators decided to use Dr. Arthur Vorwald, the new medical director at the Saranac Laboratory, to make the conspirators' requested changes. On March 15, 1948, Mr. J.P. Woodard of Johns-Manville wrote to Dr. Lanza that he had just paid Dr. Vorwald "our contribution for the current year". Mr. Woodard also requested Dr. Lanza to pressure Saranac Laboratory to get the asbestos diatomaceous earth studies in "publishable" form soon, noting considerable agitation, both in Canada and on the West Coast.

76.

On October 12, 1948, Thomas Durkin of the Saranac Laboratory informed Mr. Woodard of Johns-Manville that Dr. Vorwald had finally produced a new edition of Dr. Gardner's report which Mr. Durkin forwarded to Mr. Woodard with fifteen copies. Mr. Durkin further informed

Mr. Woodard that the report was complete except for a minor section devoted to lung cancer, and that Saranac Laboratory and Dr. Vorwald were beginning preparation of the final portion of the report, that portion dealing with human asbestosis.

77.

On October 22, 1948, Mr. Brown wrote to conspirators Ernest Mueleck and J.F.D. Rohrbac of Keasbey and Mattison, forwarding Dr. Vorwald's version of Dr. Gardner's report. Mr. Brown suggested the elimination of all references to tumors and also to pneumonia. Mr. Brown also stated that this report must be confined to the results of experiments with animals, and not be considered as the first part of a study of the effect of asbestos dust on both animals and human beings, because Dr. Vorwald, who had succeeded Gardner at Saranac Laboratory, and who did not sign the original agreement, would be more difficult to deal with when it came time to making the changes demanded by the conspirators.

78.

On October 27, 1948, Vandiver Brown of Johns-Manville wrote to all of the other conspirators sending them copies of Dr. Vorwald's report. He admonished his co-conspirators to treat the report with utmost confidence and to make it available to no one outside of the organization. Mr. Brown also warned his co-conspirators to return all drafts of the report to him because it was obviously undesirable that the report receive any distribution or publicity outside a limited number of people and the respective conspirators' organizations.

79.

On October 28, 1948, Mr. Mueleck, the President of Keasbey and Mattison, replied to co-conspirator Vandiver Brown of Johns-Manville, thanking him for the September 30, 1948 report. Mr. Mueleck outlined his comments about changes that were necessary to be made before the report was published and emphasized to Mr. Brown that the report was confidential and the property of those who advanced the funds for carrying out the experiments at the Saranac Laboratory.

80.

On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block, a Division of American Brake and Shoe Foundry, Gatke Corporation, Keasbey and Mattison Company (alter ego to conspirator T&N), Raybestos Manhattan, Inc., Thermoid Company, Union Asbestos and Rubber

Company and United States Gypsum Company, whose interests were represented at the meeting by Mr. Brown of Johns-Manville.

81.

At this November 11, 1948 meeting, these conspirators and their representatives decided to exert their influence to alter materially and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratory in 1936 as discussed above. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of critical review of the then existing dust standards for the health effects of asbestos on humans with asbestos and asbestos products. The standard sampling techniques of the day and the technique recommended by the co-conspirators to the United States Public Health Service and state public health agencies was the counting of only total particles rather than fiber when the conspirators knew that the harmful portion of asbestos is the fibrous portion rather than the particulate portion. Thus, when Dr. Gardner's research then documented the significance of counting fibers, the conspirators chose to suppress this information rather than inform the public health authorities and employees that existing standards and threshold limit values were established incorrectly and were in fact not providing adequate protection to the workers from exposure to harmful levels of asbestos dust.

82.

On November 12, 1948, Mr. Brown of Johns-Manville wrote to Manfred Bowditch, Field Director of Saranac Laboratory, reminding Mr. Bowditch of the 1936 agreement made by Dr. Gardner with the conspirators, pointing out the secrecy and prior approval provisions.

83.

On November 12, 1948, Mr. Brown also wrote to W.T. Kelly, Jr., Executive Vice President of American Brake Block, Division of the American Brake Shoe Company, and informed him that a meeting had been held to consider the Saranac Laboratory report on November 11, 1948, with all the "interested" parties represented except the Russell Manufacturing Company. Mr. Brown informed Mr. Kelly further that it was the unanimous opinion of the conspirators that all of Dr. Gardner's references in his work to cancer and tumors would be deleted prior to the revised version being published. Mr. Brown told Mr. Kelly that even though he had provided him a copy of the Gardner/Vorwald report, that the reports were numbered and expected to be returned to him because the conspirators wanted no copies of Dr.

Gardner's draft report circulating if Dr. Vorwald's version was to be different in any substantial respect.

84.

On December 6, 1948, Dr. Vorwald of Saranac Laboratory wrote to Dr. Lanza, who was now working part time as the Director of the New York University Institute of Industrial Medicine, in addition to his duties at Metropolitan Life. Dr. Vorwald informed Dr. Lanza that his job was to finish editing Dr. Gardner's work concerning the human asbestos material. He reassured Dr. Lanza that he understood that the 1936 Saranac agreement to submit articles for review by the conspirators before any publication.

85.

On December 14, 1948, Dr. Lanza, on behalf of Metropolitan Life and the other conspirators, wrote to Dr. Vorwald outlining the changes the conspirators required Dr. Vorwald to make in his draft of Dr. Gardner's work. Dr. Lanza told Dr. Vorwald that it was the consensus of the group that all references to cancers or tumors should be omitted, including any tables relating to the subject.

86.

On March 3, 1949, Mr. Brown of Johns-Manville wrote to Mr. Sabourin of the Quebec Asbestos Mining Association and forwarded to him a copy of the now "approved" Gardner/Vorwald report. Mr. Brown forwarded the report to Mr. Sabourin because of Mr. Sabourin's complicity and association with the other conspirators. Mr. Brown further suggested that Mr. Sabourin give a copy of their report to the Compensation Commission in Canada through the Ministry of Labor, in order to further the aims of the conspirators with officials in Canada. Mr. Brown warned Mr. Sabourin to otherwise keep the report in confidence until publication.

87.

On March 3, 1949, Mr. Brown also informed his fellow conspirators that he had received the Saranac final revised approved report and informed them that this report had adopted the substance of all the changes suggested by the conspirators. Mr. Brown further informed the conspirators that he had arranged for publication of the report with an appropriate introduction to be made by Dr. Lanza.

88.

In January, 1951, the final version of the Saranac report was published in the AMA Archives of Industrial Hygiene and Occupational Medicine under the title "Experimental Effects of Asbestosis." The published report wrongfully omitted Dr. Gardner's significant writings on human asbestosis and his critically important criticism of the asbestos dust threshold limit value and all mention of his animal studies on the positive relationship between asbestosis and cancer, and in keeping with the conspirators' original intent to mislead and deceive public health officials and the consuming public as set out above. On June 11, 1951, Dr. K.W. Smith, Medical Director of Johns-Manville Corporation, informed his fellow officers of the corporation that the Saranac report had received a wide and adequate circulation. Dr. Vorwald had sent reprints to a wide circle of interested medical authorities, and Mr. Sabourin had sent the report to all members of the Quebec Asbestos Mining Association. Dr. Smith further noted that the report was now in libraries of universities and medical schools across the United States.

89.

**WHEREFORE**, Petitioner demands of Defendants an amount that will fully and fairly compensate for all compensatory damages and for punitive damages to punish and deter Defendants and others similarly situated from like conduct in the future, for the costs of this action and for all other proper relief.

**PETITIONER FURTHER PRAYS** that Defendants be duly served and cited to appear and answer this petition and after all legal delays and due proceedings be had that there be judgment in favor of petitioner and against Defendants for all damages as are reasonable in the premises, together with legal interest thereon from date of judicial demand until paid and all costs of these proceedings.

**PETITIONER FURTHER PRAYS** for all general and equitable relief required or reasonable in the premises.

Respectfully submitted,
**POURCIAU LAW FIRM**

Damon R. Pourciau (31529)
2200 Veterans Memorial Blvd.
Suite 210
Kenner, Louisiana 70062
Telephone: (504) 305-2375
Facsimile: (504) 305-4168

And

GALANTE & BIVALACQUA LLC
Scott M. Galante (#26890)
650 Poydras Street, Suite 2615
New Orleans, Louisiana 70130
Telephone: (504) 648-1858
Facsimile: (504) 561-0559

**PLEASE SERVE:**

1) **ORIGINAL PETITION FOR DAMAGES;**
2) **MOTION AND INCORPORATED MEMORANDUM FOR EXPEDITED STATUS CONFERENCE AND EXPEDITED TRIAL SETTING;**
3) **ORDER FOR EXPEDITED STATUS CONFERENCE AND EXPEDITED TRIAL SETTING;**
4) **PETITION TO PERPETUATE TESTIMONY PURSUANT TO LA CODE OF CIV. PROC. ARTS. 1429, 1430, 1430.1 AND 1431; AND**
5) **EX PARTE ORDER PURSUANT TO LA CODE OF CIV. PROC. ART. 1430.1**

**AARDVARK CONTRACTORS, INC.**
Through its agent for service of process:
Charles P. Shano, Sr.
3116 Barataria Boulevard
Marrero, Louisiana 70072

**ANCO INSULATIONS, INC.**
Through its agent for service of process:
Brent J. Bourgeois
Roedel, Parsons, Koch, Blache, Balhoff, & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809-7654

**A.W. CHESTERTON COMPANY**
Through its agent for service of process:
C.T. Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**BAYER CROPSCIENCE, INC.**
Via the Louisiana Long-Arm Statute:
Corporation Service Company
80 State Street
Albany, New York 12207-2543

**BEXAR CANYON MANAGEMENT, INC.**
Through its agent for service of process:
C.T. Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**BURMASTER LAND & DEVELOPMENT CO., LLC**
Through its agent for service of process:
A.J. Burmaster
7033 Edgewater Drive
Mandeville, Louisiana 70471

**CBS CORPORATION**
Via the Louisiana Long-Arm Statute:
Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

**CERTAIN-TEED CORPORATION**
Through its agent for service of process:
C.T. Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**CHARLES JOHNSON**
436 Raleigh Court
Waynesboro, Virginia 22980

**CHARLES P. SHANO, SR.**
3116 Barataria Boulevard
Marrero, Louisiana 70072

**CRANE CO.**
Via the Louisiana Long-Arm Statute:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**CRESCENT MATERIALS SERVICE, INC.**
Through its agent for service of process:
Elizabeth F. Pretus Ebarb
10016 Idlewood Place
River Ridge, Louisiana 70123

**FMC CORPORATION**
Through its agent for service of process:
C.T. Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**CSR, LIMITED**
Via the Louisiana Long-Arm Statute:
T9 Help Street
Chatswood, NSW 2057
Australia

**CSR, LTD.**
A foreign corporation that can be served through Louisiana Counsel:
Frank Accardo, Esq.,
1100 Poydras Street,
3200 Energy Centre
New Orleans, LA 70163-1132;

**CSR, LTD.**
A foreign corporation that may be served through counsel of record in California
pursuant to the Louisiana Long Arm Statute:
Michel Futterman, Esq.,
Futterman & Dupree, LLP,
160 Sansome Street,
17 th Floor
San Francisco, California 94104

**CSR, LTD.**
A foreign corporation that may be served pursuant to the Louisiana Long Ann Statute:
CSR Limited,
9 Help Street,
Chatswood, New South Whales,
Australia 2067.

**FOSTER WHEELER CORPORATION**
Via the Louisiana Long-Arm Statute:
United States Corporation Company
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808

**GENERAL ELECTRIC COMPANY**
Through its agent for service of process:
C.T. Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**GOULDS PUMPS, LLC**
Through its agent for service of process:
C.T. Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**GREFCO, INC.**
Through its agent for service of process:
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, Louisiana  70802

**HOPEMAN BROTHERS, INC.**
Via the Louisiana Long-Arm Statute:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**HUNTINGTON INGALLS INCORPORATED**
Through its agent for service of process:
C.T. Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**IDEX CORPORATION**
Via the Louisiana Long-Arm Statute:
C.T. Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604

**INGERSOLL-RAND COMPANY**
Through its agent for service of process:
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, Louisiana 70802

**INTERNATIONAL PAPER COMPANY**
Through its agent for service of process:
C.T. Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**JEFFERSON PARISH SCHOOL BOARD**
Through its President, Mark Morgan
501 Manhattan Boulevard
Harvey, Louisiana 70058

**JOHN CRANE, INC.**
Through its agent for service of process:
C.T. Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**LIBERTY MUTUAL GROUP, INC.**
Through the Louisiana Secretary of State
3851 Essen Lane
Baton Rouge, Louisiana 70809

**MARYLAND CASUALTY COMPANY**
Through the Louisiana Secretary of State
3851 Essen Lane
Baton Rouge, Louisiana 70809

**METROPOLITAN LIFE INSURANCE COMPANY**
Through the Louisiana Secretary of State
3851 Essen Lane
Baton Rouge, Louisiana 70809

**OWENS-ILLINOIS, INC.**
Via the Louisiana Long-Arm Statute:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**TAYLOR-SEIDENBACH, INC.**
Through its agent for service of process:
Robert I. Shepard
731 South Scott Street
New Orleans, Louisiana 70119

**THE McCARTY CORPORATION**
Through its agent for service of process:
Paul Spaht
4232 Bluebonnet Blvd.
Baton Rouge, Louisiana 70809

**UNIVERSITY OF LOUISIANA SYSTEM BOARD OF SUPERVISORS THROUGH NICHOLLS STATE UNIVERSITY**
Through its President, Dr. Jim Henderson
1201 North Third Street, Suite 7-300
Baton Rouge, Louisiana 70802

**ATTORNEY GENERAL**
For the State of Louisiana
Through Jeff Landry
1885 North Third Street
Baton Rouge, Louisiana 70804

**WARREN PUMPS, LLC**
Via the Louisiana Long-Arm Statute:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**WEIR VALVES & CONTROLS USA, INC.**
Via the Louisiana Long-Arm Statute:
CT Corporation System
155 Federal Street, Suite 700
Boston, Massachusetts 02110

**WORLD TRADE CENTER OF NEW ORLEANS, INC.**
Through its agent for service of process:
Caitlin Cain
365 Canal Street, Suite 1120
New Orleans, Louisiana 70130